United States District Court
Southern District of Texas

**ENTERED**

July 06, 2021

Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT          SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| Clean Energy, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action H-19-244 |
| | § | |
| Trillium Transportation Fuels, LLC, | § | |
| Trillium USA Company, LLC, and | § | |
| Love's Travel Stops and Country | § | |
| Stores, Inc., | § | |
| Defendants. | § | |

# Report and Recommendation

Clean Energy sued Trillium Transportation Fuels, LLC, and Trillium USA Company, LLC, (collectively, Trillium) alleging violations of the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836, and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. (D.E. 1.) Clean Energy amended its complaint with leave of court, adding factual allegations, causes of action, and Love's Travel Stops and Country Stores, Inc., (Love's Travel) as a defendant. (D.E. 118; D.E. 119.) Trillium and Love's Travel filed a motion for summary judgment (D.E. 133), which was referred to the undersigned magistrate judge under 28 U.S.C. § 636(b)(1). The court recommends that the motion be granted.

## 1. Background

Clean Energy supplies renewable natural gas (RNG), compressed natural gas (CNG), and liquefied natural gas (LNG) for medium and heavy-duty vehicles, designs and builds fueling stations, and provides operation and maintenance (O&M) services for vehicle fleet customer stations. (D.E. 119 ¶ 15.) In its original complaint filed on December 13, 2018, Clean Energy alleged that Trillium induced two of Clean Energy's former employees "to breach their contractual obligations and disclose trade secrets so that Trillium could win competitive bids and divert customers from [Clean Energy]."

(D.E. 1 ¶ 1.) The original complaint alleged that Trillium misappropriated Clean Energy's CNG and LNG trade secrets and diverted its CNG and LNG customers. *Id.* ¶¶ 16–17, 25, 49–54.

On April 30, 2020, Clean Energy sought leave to file an amended complaint, which the court granted. (D.E. 107; D.E. 118; D.E. 119.) The amended complaint added Love's Travel as a defendant and expanded the factual allegations to include misappropriation of trade secrets related to Clean Energy's RNG business. (D.E. 119 ¶¶ 1, 3, 7, 11, 15–18, 23, 27–30, 33–35, 40–41, 56, 72–78.) Clean Energy also added claims of misappropriation of trade secrets in violation of the Texas Uniform Trade Secrets Act (TUTSA), Texas Civil Practice and Remedies Code § 134A, against Trillium; tortious interference with an existing contract against Trillium and Love's Travel; and civil conspiracy against Trillium and Love's Travel for the misappropriation of trade secrets. *Id.* ¶¶ 83–86, 92–97. In the alternative to the conspiracy claim, Clean Energy alleged that Trillium acted as the alter ego of Love's Travel and conspired with Charles Love to misappropriate Clean Energy's trade secrets. *Id.* ¶¶ 98–101.

Trillium and Love's Travel filed a motion to dismiss the amended complaint, to which Clean Energy responded. (D.E. 120; D.E. 124.) The court denied the motion to dismiss on the basis that the issues raised would be better resolved on summary judgment. (D.E. 131 at 2.) Shortly after the report and recommendation issued on the motion to dismiss, Trillium and Love's Travel filed an answer. (D.E. 132.)

At the same time, Trillium and Love's Travel filed a motion for summary judgment, which seeks judgment in favor of Trillium on the RNG claims under the DTSA and TUTSA and in favor of Trillium and Love's Travel on both the tortious interference and the conspiracy claims. (D.E. 133 at 11–19.) Love's Travel also seeks a ruling in its favor on alter ego. *Id.* at 19. In favor of summary judgment on these claims, Trillium and Love's Travel argue that Clean Energy lacks standing to assert misappropriation of RNG trade secrets, that the causes of action for misappropriation of RNG trade secrets and tortious interference are barred by the applicable statutes of limitations, and that, if summary judgment is granted on those claims, the civil-

conspiracy cause of action and the alter-ego theory of recovery must also be dismissed. *Id.* at 11–19. In response, Clean Energy argues that it has standing to assert the RNG misappropriation claims and that the relation-back doctrine, the fraudulent concealment doctrine, and the discovery rule apply to make the filing of the claims timely. (D.E. 148 at 14–29.)

## 2. Summary Judgment Standard of Review

"Summary judgment is appropriate only if, viewing the evidence in the light most favorable to the nonmovant, 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Davenport v. Edward D. Jones & Co.*, 891 F.3d 162, 167 (5th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). No genuine issue of material fact exists if a rational jury could not find for the nonmoving party based on the complete record. *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 455 (5th Cir. 2019) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

"The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). If this burden is met, the nonmovant must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmovant must "go beyond the pleadings," using competent summary judgment evidence to cite to "specific facts" showing a genuine issue for trial. *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 468 (5th Cir. 2010) (quoting *Celotex Corp.*, 477 U.S. at 324). The court reviews all evidence and reasonable inferences in the light most favorable to the nonmoving party. *Lincoln Gen. Ins. Co.*, 401 F.3d at 350.

## 3. Analysis

Trillium and Love's Travel assert two legal challenges to Clean Energy's RNG claims: standing and limitations. The standing argument is that Clean Energy has not asserted its own legal rights but the rights of a third-party entity. This is a prudential, not

constitutional, standing argument that does not implicate jurisdictional concerns. *See RLB Contracting, Inc. v. Genesis Energy, L.P.*, Civil Action H-18-3844, 2020 WL 5880918, at *3 (S.D. Tex. Oct. 2, 2020) (stating that prudential standing arguments do not challenge the court's jurisdiction "but the prudential limitation on the [courts'] *exercise* of that jurisdiction" (alteration in original) (quoting *Ensley v. Cody Res., Inc.*, 171 F.3d 315, 320 (5th Cir. 1999))). Because subject matter jurisdiction is not in question, the court first considers Trillium and Love's Travel's arguments under the applicable statutes of limitations.

Trillium argues that the claim for misappropriation of RNG trade secrets and the claim for tortious interference with its RNG contract with Republic Services are barred by limitations. A claim of trade secret misappropriation requires proof of a trade secret, acquisition through improper means, and use of the trade secret without authorization. 18 U.S.C. § 1839(5)(B) (defining misappropriation); Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(3)(B) (same); *see also M-I L.L.C. v. Q'Max Sols., Inc.*, Civil Action No. H-18-1099, 2019 WL 3565104, at *3 (S.D. Tex. Aug. 6, 2019) (listing same elements for state and federal misappropriation claims). A claim of tortious interference requires proof of "the existence of a contract subject to interference, an act of interference that was wil[l]ful and intentional, proximately causing plaintiff's damages, with actual damage or loss to plaintiff." *Polyflow, L.L.C. v. Specialty RTP, L.L.C.*, 993 F.3d 295, 305 (5th Cir. 2021) (quoting *Fridl v. Cook*, 908 S.W.2d 507, 513 (Tex. App.—El Paso 1995, writ dism'd w.o.j.)).

A misappropriation claim under DTSA "may not be commenced later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d). Although TUTSA does not state a limitations period, the Texas Civil Practice and Remedies Code dictates that a misappropriation claim must be brought "not later than three years

after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." Tex. Civ. Prac. & Rem. Code Ann. § 16.010(a); *see also Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 721 (Tex. 2016). The tortious interference claim is subject to a two-year statute of limitations. *Nath v. Tex. Children's Hosp.*, 446 S.W.3d 355, 370 (Tex. 2014); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 16.003.

Clean Energy does not dispute that these are the applicable limitations periods. Rather, Clean Energy argues that the amended complaint relates back to the date on which the original complaint was filed and that the limitations period is tolled under the fraudulent concealment doctrine and the discovery rule.

### A. Relation Back

Federal Rule of Civil Procedure 15(c) allows an amendment to relate back to the date of the original pleading: (1) when the applicable statute of limitations allows relation back; (2) when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out . . . in the original pleading[;]" or (3) when, under certain circumstances, the amendment changes a party or the naming of a party against whom a claim is asserted.

The claims pertaining to the RNG business in the amended complaint are of a completely different species than those related to the CNG and LNG business described in the original complaint. Clean Energy originally described its business as "supplying" actual natural gas for medium- and heavy-duty vehicles. (D.E. 1 ¶ 13.) Clean Energy also described its business to include "design[ing], build[ing], and operat[ing] fueling stations[,]" servicing, for example, mass transit fleets. *Id.* Clean Energy similarly described Trillium's business in the original complaint as contracting with mass transit agencies to provide O&M services for CNG stations. *Id.* ¶ 19. The confidential information specifically described as being misappropriated in the original complaint included various confidential documents pertaining to mass transit customers, fuel customers, and O&M customers. *Id.* ¶¶ 38–41, 50–54.

5

The amended complaint changes gears. In addition to the business fields described in the original complaint, Clean Energy adds an entirely new field of business—RNG. Clean Energy now alleges that this was a completely new business area for Trillium and Love's Travel. (D.E. 119 ¶¶ 3, 23.) In the amended complaint, Clean Energy describes its business as including "the creation of tradeable federal and state environmental credits." *Id.* ¶ 17. To successfully engage in the trading of those credits, Clean Energy needed a consistent supply of RNG. *Id.* Thus it came up with confidential methods "for sourcing offtake[]agreements and development projects to ensure it had access to consistent RNG supply sources." *Id.*

The amended complaint includes new allegations about Love's work at Clean Energy before leaving for Trillium. (D.E. 119 ¶ 27.) "During his time at Clean Energy, . . . Love enthusiastically embraced RNG, working extensively with Harrison Clay—Clean Energy's most senior RNG executive—to market and sell this new and unique product to customers." *Id.* The amended complaint explains that Love learned Clean Energy's confidential marketing methods and strategies for obtaining offtake agreements and for selling RNG. *Id.* Clean Energy now alleges that it was Trillium's intention in hiring Love that Love jump start their RNG business. *Id.* ¶ 28.

Clean Energy also added several new categories of trade secrets to its amended complaint. (D.E. 119 ¶ 73.) These include methods and strategies for pricing RNG and for pricing and trading LCFS and D3 RIN credits and methods for balancing RNG supply with distribution. *Id.* These business areas and trade secrets were not mentioned at all in the original complaint and are plainly new and unrelated to the business areas and trade secrets initially described. Clean Energy's newly alleged tortious interference claim relates to its RNG contract with Republic Services, which was not mentioned in the original pleading and arises out of different conduct than that originally pleaded.

The claims in the two complaints may be similar, but they are factually distinct. Although Love allegedly took CNG, LNG, and RNG

trade secrets when he left Clean Energy, the nature and alleged use of the trade secrets give rise to different acts of misappropriation. *See Schirle v. Sokudo USA, L.L.C.*, 484 F. App'x 893, 901 (5th Cir. 2012) (holding that, under either federal or Texas law on relation back, allegedly defamatory statements raised after the expiration of the limitations period that differed factually from the statements originally raised did not relate back). As explained below, the court finds that Clean Energy knew facts giving rise to the RNG misappropriation claims well before the filing of its original complaint. The court thus concludes that Clean Energy deliberately chose, as master of its pleading, not to include the RNG claims. The newly raised causes of action do not relate back.

Turning to the addition of Love's Travel, Rule 15(c)(1)(C) "is meant to allow an amendment changing the name of a party to relate back to the original complaint *only if the change is the result of an error, such as a misnomer or misidentification.*" *Miller v. Mancuso*, 388 F. App'x 389, 391 (5th Cir. 2010) (quoting *Jacobsen v. Osborne*, 133 F.3d 315, 320 (5th Cir. 1998)). Clean Energy fails to demonstrate that the addition of Love's Travel as a defendant fits within these parameters. Clean Energy always knew about Love's Travel, and there has never been any confusion about the identification of the parties. The claims against Love's Travel do not relate back.

### B. Fraudulent Concealment

Where applicable, fraudulent concealment precludes the running of the limitations period "until the claimant, using reasonable diligence, discovered or should have discovered the injury." *Regency Field Servs., LLC v. Swift Energy Operating, LLC*, ___ S.W.3d ___, No. 19-0545, 2021 WL 1823048, at *5 (Tex. May 7, 2021) (quoting *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 750 (Tex. 1999)). Fraudulent concealment applies when the "defendant is under a duty to make disclosure but fraudulently conceals the existence of a cause of action from the party to whom it belongs[.]" *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 366 (5th Cir. 2000). The elements of the defense are: (1) the defendant had

actual knowledge that a wrong occurred; (2) the defendant had a duty to disclose the wrong; and (3) the defendant had a fixed purpose to conceal the wrong. *Williams v. Allstate Fire & Cas. Ins. Co.*, Civil Action No. H-11-530, 2012 WL 1098424, at *6 (S.D. Tex. Mar. 30, 2012) (quoting *Seureau v. ExxonMobil Corp.*, 274 S.W.3d 206, 228 (Tex. App.–Houston [14th Dist.] 2008, no pet.)). The burden to show that fraudulent concealment applies is on the party asserting it. *Seatrax, Inc.*, 200 F.3d at 366.

Clean Energy argues that "Love actively concealed the fact that he took confidential information from Clean Energy when he left the company in 2016[;]" failed to disclose that fact in arbitration "when given the opportunity and obligation" to do so; and, "through his attorney, knowingly misrepresented to Clean Energy in December 2016 that [he was] not in possession of any materials belonging to Clean Energy[.]" (D.E. 148 at 17; D.E. 158 at 3.) Because Love is not a defendant in this action, his alleged concealment of information does not give rise to tolling the statutes of limitations for claims against Trillium and Love's Travel. *See Williams*, 2012 WL 1098424 at *6 (stating that a plaintiff asserting the defense must show that *the defendant* engaged in the fraudulent concealment). Clean Energy points to no evidence showing that Trillium and Love's Travel, *the defendants* in this case, had actual knowledge, a duty to disclose, or a fixed purpose to conceal the wrong.

Clean Energy also argues that Trillium and Love's Travel fraudulently concealed their tortious interference with the Republic Services contract; however, Clean Energy offers only conclusory allegations without pointing to evidence of fraudulent concealment. (D.E. 148 at 20–21.) Allegations and arguments are insufficient to meet Clean Energy's summary judgment burden. *See Anderson*, 477 U.S. at 248 (stating that the nonmovant may not rest on "mere allegations" but "must set forth specific facts"); *Bustos*, 599 F.3d at 468 (stating that the nonmovant must cite to "specific facts" found in competent summary judgment evidence).

8

The foregoing aside, the doctrine of fraudulent concealment does not apply in this case to toll the limitations periods on the newly added RNG claims. As discussed in the next section, Clean Energy had knowledge of the alleged wrongdoing within the applicable limitations periods. *See Valdez v. Hollenbeck*, 465 S.W.3d 217, 230 (Tex. 2015) ("[T]he estoppel effect of fraudulent concealment ends when a party learns of facts, conditions, or circumstances which would cause a reasonably prudent person to make inquiry, which, if pursued, would lead to the discovery of the concealed cause of action." (quoting *Borderlon v. Peck*, 661 S.W.2d 907, 909 (Tex. 1983))).

### C. Discovery Rule

"Under Texas law the discovery rule provides a 'very limited exception to statutes of limitations' by tolling the limitations period 'until the plaintiff knew or, exercising reasonable diligence should have known of facts giving rise to the cause of action.'" *Sansom v. Mintz*, 781 F. App'x 359, 361 (5th Cir. 2019) (quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996)); *see also Regency Field Servs., LLC*, 2021 WL 1823048, at *5 (quoting *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996)). The limitations period is not tolled, however, if the plaintiff is "apprised of facts that would prompt a reasonably diligent person to make an inquiry that would lead to the discovery of the cause of action." *Sw. Energy Prod. Co.*, 491 S.W.3d at 724; *Seureau*, 274 S.W.3d at 228; *see also Sansom*, 781 F. App'x at 361.

Both federal and Texas statutes of limitations for trade secret misappropriation expressly incorporate the discovery rule. *See* 18 U.S.C. § 1836(d); Tex. Civ. Prac. & Rem. Code Ann. § 16.010(a). The limitations period for the tortious interference claim may also be tolled by the discovery rule if applicable under the facts. *Sansom*, 781 F. App'x at 360–62 (finding that the discovery rule did not toll tortious interference and other claims because the facts alleged showed that the plaintiff was put on notice of the claims more than two years before the suit was filed). "[M]ere surmise, suspicion, and accusation" or "subjective beliefs and opinions" alone are insufficient

9

to stop tolling under the discovery rule. *Sw. Energy Prod. Co.*, 491 S.W.3d at 724; *Seureau*, 274 S.W.3d at 228; *see also Sansom*, 781 F. App'x at 361.

Clean Energy filed a motion for leave to amend to add the RNG misappropriation and tortious interference claims on April 30, 2020. (D.E. 107.) Thus, the question is whether Clean Energy knew or should have known facts that, in the exercise of reasonable diligence, would have led to the discovery of the alleged misappropriation on or before April 30, 2017, and the alleged tortious interference on or before April 30, 2018.

### i. *Misappropriation of Trade Secrets*

The court first considers whether the discovery rule applies to the misappropriation claim. As stated above, a plaintiff must show the existence of a trade secret that was acquired through improper means and that was used without authorization. *See M-I L.L.C.*, 2019 WL 3565104, at *3. Trillium points to facts in evidence that it argues establish that Clean Energy knew or should have known of the alleged misappropriation in December 2016.

### a. *Information Known to Clean Energy in December 2016*

The factual basis for the new misappropriation claims dates back to September 2016 when Love parted ways with Clean Energy. When Love resigned from Clean Energy, he stated that he was leaving to sell "tube trailer gas to utilities and off-pipeline users" for Love's Travel, his family's business. (D.E. 133-1 at 23; D.E. 152-1 at 6, 19.) According to Derek Turbide, vice president of Clean Energy's western region and Love's direct supervisor, Love "didn't even talk about CNG or LNG" at the end of his tenure with Clean Energy but, rather, focused on RNG. (D.E. 133-1 at 23.) At the time of his departure, Love refused to sign a nondisclosure acknowledgment as to confidential information but avowed that he would not be competing with Clean Energy. (D.E. 133-1 at 23; D.E. 152-1 at 6, 19.) Turbide later opined that Love probably wanted to start an RNG division within Love's Travel. (D.E. 133-1 at 23.) Clean Energy thus knew that Love

expressed a strong interest in and sought information about the RNG business. Clean Energy also knew that Love had refused to acknowledge his obligation not to disclose Clean Energy's confidential information.

On the evening of December 5, 2016, Clay, the president of Clean Energy Renewable Fuels, LLC, (CERF), observed Love at the Annual RNG Coalition Conference "talking to all the guys that [Love] knew were [Clean Energy's] producers" and soliciting their business. (D.E. 133-1 at 16, 25; D.E. 152-1 at 7.) A Clean Energy customer presented Love's Trillium business card to Clay, which reflected that Love was working in Trillium's RNG division. (D.E. 133-1 at 17, 25.) At his deposition, Clay admitted that, as of December 6, 2016, it was clear Love was working for Trillium and was contacting Clean Energy's RNG producers and customers. *Id.* at 21. Clean Energy thus knew in December 2016 that Love falsely represented that he would be selling "tube trailer gas" and would not be competing with Clean Energy. Clean Energy also knew that Love was not merely competing with Clean Energy but was actively targeting Clean Energy's business contacts.

Love's appearance at the RNG conference sparked a flurry of communications inside Clean Energy. The next morning, Clay sent an email to Nate Jensen, general counsel for Clean Energy entities; Andrew Littlefair, chief executive officer for Clean Energy entities; Clay Corbus, Clean Energy's vice president of strategic development; and Turbide, Love's former supervisor, to inform them that Love was soliciting, on Trillium's behalf, RNG business from Clean Energy's producer partners and customers. (D.E. 133-1 at 21, 25.) The email asked, "Did [Love] have any kind of restriction on his activity or *use of information* f[ol]lowing his departure[?]" *Id.* at 25 (emphasis added).

Jensen quickly replied to the email, explaining that Love had "a continuing obligation to protect and not misuse [Clean Energy's] confidential and proprietary information" and asking for "a bullet point summary of proprietary information/processes/data" that Clay

had "shared with [Love] while he was employed with Clean Energy." (D.E. 133-1 at 25.) Within minutes, Clay emailed this list of confidential and proprietary information known to be in Love's possession: (1) "all of [the] pricing for third party transit customers[;]" (2) customer lists; (3) projections and trading data on Renewable Identification Numbers (RIN) and Low Carbon Fuel Standard (LCFS) Credits; (4) "fixed price discount pricing versus LCFS and RIN[;]" (5) "CLNE[1] upstream economics with producers[;]" (6) the identities of producers and locations of projects; and (7) "carbon credit accounting for customers and analysis of customer to claim carbon benefit notwithstanding LCFS credit sale." *Id.* at 24. About Love, Clay wrote, "He was unique among our sales force in his desire to learn this [RNG] part of the business and really understand it. In retrospect my conspiracy radar is firing." *Id.* That afternoon, Turbide also joined the email string, commenting that Love could not be trusted and that Clean Energy needed to be sure its customers and partners were "aware of the facts when . . . Love show[ed] up everywhere," which Turbide said he was sure that Love would do. *Id.* at 23.

As demonstrated by the emails, Clean Energy knew specific trade secrets to which Love had been given access, including the identities of producers and customer information. Based on Clay's observations at the RNG conference, Clean Energy had reason to believe that Love was using the confidential information to solicit Clean Energy's producers and customers. Clay's inquiry about restrictions on Love's use of information shows that Clay was in fact alerted to the likelihood that Love was using confidential information. Top executives of Clean Energy also expressed distrust of Love and considered warning Clean Energy's customers and partners about him.

On December 8, 2016, Jensen, on behalf of Clean Energy, sent Love's attorney a cease-and-desist letter stating that Clean Energy had

---

[1] CLNE is Clean Energy's stock symbol.

"learned troubling information regarding . . . Love that requires his immediate attention." (D.E. 152-1 at 18.) The letter stated that "Love had access to Clean Energy's confidential and trade secret information[,]" specifically listing the seven categories of proprietary information Clay had identified two days earlier. *Id.* The letter demanded the return of "any and all documents prepared at, by or for Clean Energy, including all copies[,]" demanded that "Love immediately cease and desist from using any of its trade secrets or confidential information[,]" and threatened suit under the Uniform Trade Secrets Act. *Id.* at 19. Clean Energy was more than merely suspicious at that point as reflected in the letter that not only requested the return of all documented confidential information but also threatened a misappropriation lawsuit. *Id.* The letter, despite its conditional language, demonstrated a belief that Love was using its RNG trade secrets.

Taken together, the facts available to Clean Energy in December 2016 were sufficient to alert Clean Energy to RNG misappropriation or, at a minimum, to prompt it to make further inquiry that would have led to discovery of the cause of action. *See Sansom*, 781 F. App'x at 362 ("The district court properly recognized that[,] if Sansom was suspicious enough to send [a] letter [requesting materials pertaining to excessive and unauthorized billing], he was apparently 'apprised of facts that would prompt a reasonably diligent person to make an inquiry that would lead to discovery of the cause of action.'" (quoting *Sansom v. Mintz*, Civil Action No. 3:18-CV-637-N, 2018 WL 11026384, at *1 (N.D. Tex. Dec. 21, 2018))).

### b. Informative Caselaw

Two cases cited but not discussed by the parties provide guidance in analyzing whether the discovery rule tolled the running of the statute of limitations. In *Southwestern Energy Production Company v. Berry-Helfand*, the Supreme Court of Texas affirmed a jury finding in favor of a petroleum engineer on misappropriation of trade secrets. 491 S.W.3d at 709–10, 721–25. The engineer developed a methodology for pinpointing "sweet spots" for drilling and

producing in the James Lime reservoir in East Texas. *Id.* at 705. In hopes of selling the prospects to Southwestern Energy Production Company (SEPCO) or developing them together, the engineer's company presented to SEPCO detailed information on two prospects under confidentiality and noncompete agreements. *Id.* at 706–07. After the presentation in February 2005, SEPCO did not make an offer within the exclusive evaluation period but retained the engineer's information and data until she requested it back. *Id.* at 706-08.

Without notifying the engineer, SEPCO then actively pursued drilling in the areas the engineer had identified as "sweet spots" and obtained interests in hundreds of leases including the two prospects discussed in the presentation. *Sw. Energy Prod. Co.*, 491 S.W.3d at 708. Virtually all SEPCO's leases or wells were in the sweet-spot acreage and "there was no lemon in the bunch." *Id.* at 709. The engineer brought suit against SEPCO in February 2009 based on information produced in other litigation. *Id.* at 709. SEPCO argued that the discovery rule's tolling effect ceased in 2005, citing: (1) emails in May 2005 that revealed the engineer's "concerns and suspicions about SEPCO's retention of [the] proprietary information[;]" and (2) the engineer's testimony that she knew SEPCO was drilling in the sweet-spot areas in the summer of 2005. *Id.* at 722.

The court found SEPCO's evidence to be nothing more than "mere surmise, suspicion, and accusation," and explained that "[w]ithout more, subjective beliefs and opinions are not facts that in the exercise of reasonable diligence would lead to the discovery of a wrongful act." *Id.* at 724. The court determined that the emails reflected that the engineer's "main concern was retrieving her data" and that, after SEPCO returned her information, she had no objective basis for further inquiry. *Sw. Energy Prod. Co.*, 491 S.W.3d at 724. The court also found that SEPCO pointed to no evidence demonstrating what the engineer would have discovered if she had inquired further. *Id.* According to the court, the engineer's awareness of SEPCO's drilling in the summer of 2005 appeared to be limited to information she knew prior to the presentation in February 2005,

14

which did not include SEPCO's acquisition of new leases in the areas that were identified in the presentation. *Id.* The court concluded that SEPCO failed to overcome the jury's finding with conclusive evidence that the engineer knew or, with reasonable diligence, could have discovered that SEPCO was using her trade secrets prior to the expiration of the limitations period. *See id.* at 722, 725.

In summary, the party that allegedly misappropriated trade secrets was a business entity with which the plaintiff shared confidential information in the course of developing a business relationship. A deal was not struck. The plaintiff's interaction with SEPCO ended as soon as her presentation materials were returned. The evidence did not show that the plaintiff knew that SEPCO expanded its acquisition of lease interests and increased drilling in the sweet-spot areas.

The other case, *Seatrax, Inc.*, 200 F.3d at 358, is factually more akin to this case. Seatrax, Inc., a corporation that manufactured SEAKING brand offshore marine cranes, sued three individuals and Sonbeck, International, Inc., (Sonbeck), a company they formed as an "'aftermarket supplier' of replacement parts for offshore marine cranes." *Id.* at 362–63. Prior to forming their company, the three individuals were employed by Branham Industries, Inc. (BII). *Id.* at 362. BII had been a licensee of "SEAKING" offshore marine cranes and "was given access to technical information, manuals, service bulletins, computer software and SEAKING manufacturer drawings[.]" *Id.* After the licensing agreement expired in 1990, the licensors "filed suit against BII claiming unpaid royalties and that BII refused to return the SEAKING technology." *Id.* The individual defendants left BII during that litigation and formed Sonbeck. *Id.* at 362–63. During that same time, "Sonbeck entered into a sales agency agreement with Seatrax to assist Seatrax in selling SEAKING parts[,]" and "Seatrax also purchased SEAKING parts from Sonbeck." *Id.* at 363. The agreement was terminated in 1992. *Id.*

In 1996, Seatrax filed suit alleging misappropriation of trade secrets under Texas law and other causes of action. *Seatrax, Inc.,*

200 F.3d at 363. Seatrax argued that it did not become aware of the misappropriation, which occurred in 1990 to 1992, until 1996 when it learned through discovery that Sonbeck had numerous SEAKING drawings in its possession. *Id.* at 363, 365. The Fifth Circuit affirmed the district court's grant of summary judgment against Seatrax on the misappropriation claim. *Id.* at 363, 373.

The court found that "the summary judgment evidence reveal[ed] that several events occurred between 1990 and 1992 that should have put Seatrax on notice of possible misappropriation." *Seatrax, Inc.*, 200 F.3d at 365. The court found significant that: (1) the individual defendants formed Sonbeck during the BII litigation in 1991; (2) they had access to the SEAKING drawings when they worked for BII; (3) the SEAKING drawings were not on the BII premises after the litigation; (4) Seatrax purchased replacement SEAKING parts from Sonbeck; and (5) Seatrax's customers raised questions about Sonbeck's status as a distributer of SEAKING parts. *Id.* at 365–66. Although the Fifth Circuit described the known facts in terms of "suspicion," stating "[a]s such, 'suspicions should have abounded' when the defendants left BII, formed Sonbeck, and shortly thereafter began marketing a product similar to that previously developed by BII and marketed by Seatrax," it is clear that the court saw much more than mere suspicion. The court noted that the facts known to the plaintiff "created a red flag for possible misappropriation of trade secrets." *Id.* at 366–67 (quoting *Computer Assocs. Int'l, Inc.*, 918 S.W. 2d at 457).

The dividing line between the two cases is whether the plaintiff was on notice of *facts* as opposed to mere subjective beliefs. Here, Clean Energy had much more than subjective surmise, suspicion, and accusation. They had facts. Clean Energy knew: (1) Love had access to Clean Energy's RNG trade secrets, including the identities of its RNG producers and customer information; (2) Love refused to acknowledge an obligation to protect Clean Energy's confidential information; (3) Love misrepresented his intentions upon leaving Clean Energy; (4) Love worked in the RNG business for Trillium; and

(5) Love solicited business from entities that he knew were producers and customers of Clean Energy. These facts should have put Clean Energy on notice of possible misappropriation. *Cf. Computer Assocs. Int'l, Inc.*, 918 S.W.2d at 457 (noting that[,] "in a world of high employee mobility and easy transportability of information[,] . . . it is not unexpected that a former employee will go to work for a competitor and that the competitor might thereby acquire trade secrets").

This case is distinguishable from *Seatrax, Inc.* in only one material way—Clean Energy's top executives actually discussed their belief that Love was engaged in wrongdoing and immediately acted on it by sending a cease-and-desist letter to Love.

### c. Evidence Clean Energy Discovered in Early 2020

Despite all the facts Clean Energy learned in December 2016 about Love's actions on Trillium's behalf, Clean Energy now asserts that it "had no idea that . . . Love had stolen any information, much less the full scope of the information he took." (D.E. 148 at 16.) Clean Energy argues that it did not possess sufficient information until, through discovery, forensic data from Love's Trillium computer was produced in early 2020. *Id.* at 17. According to Clean Energy, it was then that it discovered Love possessed "sensitive 'site statements'" that included "site-specific costs, margins, operating income, and volume for all of its RNG customers" and that Love had accessed those site statements days after starting at Trillium. *Id.* at 7. Clean Energy points also to Love's admission, for the first time, during his January 2021 deposition that he took Clean Energy documents. *Id.*

As illustrated above, the evidence of Clean Energy's communications and actions in December 2016 belie Clean Energy's retrospective representation that it had no idea that Love was doing anything more than competing with Clean Energy. In December 2016, Clean Energy knew that Love had access to RNG trade secrets, that Love had misrepresented both his future role at Trillium and his reason for not signing the nondisclosure acknowledgement, and that Love was soliciting Clean Energy's RNG customers and producers.

In email communications at that time, Clay identified multiple RNG trade secrets that he had conveyed to Love. (D.E. 133-1 at 24.) These included customer lists, locations of projects, information on carbon credit accounting, and projections and trading data on RIN and LCFS credits. *See id.* A trade secret is a trade secret "whether tangible or intangible[] and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing . . . ." 18 U.S.C. 1839(3); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(6). The discovery of evidence during litigation that Love possessed more trade secrets than originally known or that Love saved trade secrets digitally does not warrant tolling in this case. Similarly, evidence showing that Love accessed the digitally stored trade secrets and Love's late admission that he took Clean Energy documents does not add any necessary information to Clean Energy's body of knowledge as of December 2016. Just because Clean Energy's case improved through discovery does not mean that Clean Energy lacked knowledge in December 2016 of facts sufficient to put Clean Energy on notice of potential RNG misappropriation claims. *See* Fed. R. Civ. P. 11 (stating that, by filing a pleading, an attorney "certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" the factual contentions either have evidentiary support or "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery").

Clean Energy argues that six documents produced in early January 2020 were what pushed the RNG misappropriation claims over the threshold necessary for pleading the cause of action: (1) Love's handwritten notes dated October 12, 2016, titled "RNG Action Plan • Develop[;]" (2) Love's handwritten notes dated November 25, 2016, including on a to-do list the task of reviewing "old journal[;]" (3) calendar entry dated October 18, 2016, for a meeting on "RNG in CA[;]" (4) calendar entry dated October 26, 2016, for a meeting on "Trillium RNG Data Dump[;]" (5) calendar entry dated October 27, 2016, for a meeting on "RNG Introductions[;]" and (6) calendar entry

dated October 27, 2016, for a meeting on "RNG Game Plan." (D.E. 148 at 7, 9, 117, 119, 121, 123–24, 261.)

These documents, considered individually or collectively, show only that Love was working in the RNG space—a fact they already knew when he appeared at the conference. These documents do not show that Love possessed or used any specific trade secrets, that he acquired them improperly, or that he used them without authorization. In other words, none of these documents shows that Love misappropriated Clean Energy's RNG trade secrets. These documents are cumulative evidence that add nothing to Clean Energy's December 2016 body of knowledge.

The court concludes that, in December 2016, Clean Energy knew or should have known of facts giving rise to the RNG misappropriation cause of action. The evidence of Clean Energy's internal communications in December 2016 shows that its top executives saw what the court sees now. The discovery rule does not apply and the RNG misappropriation claims are barred by the applicable statutes of limitations. Because the RNG misappropriation claims are barred, the court need not address whether Clean Energy has prudential standing to bring those claims.

### ii. Tortious Interference with an Existing Contract

In the amended complaint, Clean Energy alleged that Love "became directly involved in an effort by Trillium and Love's Travel to win an RNG and O&M contract with Clean Energy's longtime customer, Republic Services." (D.E. 119 ¶ 40.) As factual support, Clean Energy alleged that "[t]ogether with Love's Travel, Charles Love worked throughout early December 2016 to pry this important customer from Clean Energy" by misrepresenting Clean Energy's financial situation and leveraging a separate business arrangement between Republic Services and Love's Travel. *Id.* Clean Energy also alleged that, although Trillium was not successful in getting Republic Services' contract, Republic Services used Trillium's proposal "to extract significant and costly concessions in a renegotiated natural gas supply contract." *Id.* at ¶ 41.

Clean Energy admits in its response that it "knew that Trillium and Love's Travel had been meddling in its relationship with Republic [Services]." (D.E. 148 at 21.) Clean Energy also concedes that the tortious interference claim accrued no later than March 23, 2017, when Clean Energy became aware of "the nature of the injury and damage caused by Defendants' tortious interference." *Id.* at 22. As Clean Energy argues, "Given that accrual date, Clean Energy had until March 23, 2019, to bring suit." *Id.*

The motion for leave to amend was filed more than a year after the expiration of the limitations period. Conflating the doctrines allowing tolling of the limitations period, Clean Energy argues that, due to *fraudulent concealment*, the *discovery rule* applies and the tortious interference claim *relates back* to the filing of the original complaint. As discussed above, neither relation back nor fraudulent concealment applies. Moreover, neither fraudulent concealment nor the discovery rule could save the claim because Clean Energy admits that it knew of the tortious interference no later than March 23, 2017. The tortious interference claim is barred by limitations.

### iii. Civil Conspiracy and Alter Ego

Clean Energy alleged, for the first time in its amended complaint, that Trillium and Love's Travel conspired to misappropriate Clean Energy's trade secrets. As a derivative tort, civil conspiracy is subject to the same statutes of limitations that apply to the underlying cause of action. *See Agar Corp. v. Electro Cirs. Int'l, LLC*, 580 S.W. 3d 136, 138 (Tex. 2019) ("Because civil conspiracy is a derivative tort that 'depends on participation in some underlying tort,' . . . the applicable statute of limitations must coincide with that of the 'underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable.'" (quoting *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996))). Clean Energy's civil conspiracy claim is

therefore also barred by limitations because the underlying tort of misappropriation is barred.[2]

Similarly, Clean Energy's allegation of liability based on alter ego depends on the viability of an underlying claim. *See U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*, 761 F.3d 409, 442 (5th Cir. 2014) ("[U]nder Texas law, while alter ego theory is a means to pierce the corporate veil, it still relies on an underlying claim."). Because Clean Energy cannot maintain any claims against Love's Travel, it also cannot pierce the corporate veil and impute liability based on Trillium's actions to Love's Travel under the theory of alter ego.

*4. Conclusion*

For the reasons explained above, the court recommends that Trillium and Love's Travel's motion for summary judgment (D.E. 133) be granted.

The parties have fourteen days from service of this Report and Recommendation to file written objections. 28 U.S.C. § 636(b)(1)(c); Fed. R. Civ. P. 72. Failure to timely file objections will preclude appellate review of factual findings or legal conclusions, except for plain error. *See Thomas v. Arn*, 474 U.S. 140,
147–49 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276–77 (5th Cir. 1988).

Signed at Houston, Texas, on July  6 , 2021.

Peter Bray
United States Magistrate Judge

---

[2] To the extent that Clean Energy sought to tie the conspiracy claim to the originally pleaded CNG and LNG misappropriation claims, the discovery rule also does not apply because Clean Energy points to the discovery of no new information giving rise to a conspiracy action on that basis.

21