United States District Court
Southern District of Texas
**ENTERED**
August 24, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT                SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| Clean Energy, | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | Civil Action H-19-244 |
| | § | |
| Trillium Transportation Fuels, LLC, | § | |
| Trillium USA Company, LLC, and | § | |
| Love's Travel Stops and Country | § | |
| Stores, Inc., | § | |
|     Defendants. | § | |

# Report and Recommendation

Clean Energy's remaining claims against Trillium Transportation Fuels, LLC, and Trillium USA Company, LLC, (collectively, Trillium) are those alleging misappropriation of Clean Energy's trade secrets related to its compressed natural gas (CNG) business. Clean Energy alleges violations of both the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836, and the Texas Uniform Trade Secrets Act (TUTSA), Tex. Civ. Prac. & Rem. Code §§ 134A.001–134A.008. Trillium moves for summary judgment on both remaining claims. ECF No. 182. The court recommends that the motion be denied.

### 1. Procedural Background and Facts[1]

Clean Energy and Trillium compete in the business of building, operating, and maintaining CNG fueling stations for municipal transit agencies. The parties bid against each other to obtain operation and maintenance (O&M) contracts for CNG fueling stations. Such contracts are often obtained via a competitive bidding process that is

---

[1] The court includes in this section only a general factual summary and will include in the analysis below a more detailed factual discussion as it is relevant to each issue.

initiated when the agency issues a request for proposal (RFP). Companies compete against one another by demonstrating their ability to fulfill the contract as well as by bidding the lowest price.

In late 2016, Ryan Forrest and Charles Love were Clean Energy employees whose job responsibilities included working on bids for O&M contracts. Both had signed non-disclosure agreements when they began work at Clean Energy. At some point in 2016, Love's Travel Stops & Country Stores, Inc. (Love's Travel) acquired Trillium. Two of Charles Love's family members, Tom Love and Frank Love,[2] were members of Love's Travel's management (Frank Love was the CEO) and sought to recruit Love to work at Trillium. Love resigned from Clean Energy on September 29, 2016, and began work at Trillium on October 10, 2016. After he left Clean Energy, Love began to recruit Ryan Forrest, who had taken over some of Love's responsibilities at Clean Energy, to work at Trillium. Forrest resigned from Clean Energy on July 25, 2017.

According to Clean Energy, before leaving their jobs at Clean Energy, both Love and Forrest copied numerous confidential Clean Energy documents onto USB drives. Clean Energy also asserts that Love took with him to Trillium a set of approximately twenty notebooks in which he kept a large volume of confidential Clean Energy information, including documentation of Love's daily activities, meeting notes, and notes about discussions and negotiations. Clean Energy maintains that the USB drives and Love's notebooks contained Clean Energy's trade secrets.

Clean Energy claims that among the trade secrets Love and Forrest misappropriated were confidential documents pertaining to two of Clean Energy's existing customers—the County of Los Angeles, and the Regional Transportation Commission of Southern Nevada (Nevada RTC). Clean Energy claims that Love and Forrest, in concert with others at Trillium, used Clean Energy's trade secrets to outbid

---

[2] To avoid confusion among the various Love family members, the court will refer to Charles Love as "Love," and to his family members by their full names.

Clean Energy for contracts with its two existing customers to the financial detriment of Clean Energy.

Clean Energy filed this lawsuit on December 13, 2018, asserting causes of action under the DTSA and the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030. ECF No. 1. Clean Energy amended its complaint with leave of court on August 4, 2020, adding Love's Travel as a defendant and adding causes of action for trade secret misappropriation under TUTSA, tortious interference with an existing contract, civil conspiracy, and alter ego. ECF No. 119. Clean Energy also sought to expand its trade secret misappropriation claims beyond those related to CNG to include trade secrets relating to renewable natural gas (RNG). The court granted Defendants' motion for summary judgment, ECF No. 133, dismissing the tortious interference with contract, civil conspiracy, and alter ego claims as time barred. ECF No. 168. The court also dismissed the trade secret misappropriation claims to the extent they related to RNG. *Id.* The parties have represented to the court that Clean Energy is no longer pursuing its claims under the CFAA. Thus, the only claims remaining in the case are for misappropriation of trade secrets under DTSA and TUTSA. Defendants now move for summary judgment on those claims. ECF No. 182.

2. *Summary Judgment Standard of Review*

"Summary judgment is appropriate only if, viewing the evidence in the light most favorable to the nonmovant, 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Davenport v. Edward D. Jones & Co.*, 891 F.3d 162, 167 (5th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). No genuine issue of material fact exists if a rational jury could not find for the nonmoving party based on the complete record. *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 455 (5th Cir. 2019) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

"The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th

Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). If this burden is met, the nonmovant must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmovant must "go beyond the pleadings," using competent summary judgment evidence to cite to "specific facts" showing a genuine issue for trial. *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 468 (5th Cir. 2010) (quoting *Celotex Corp.*, 477 U.S. at 324).

The court reviews all evidence and reasonable inferences in the light most favorable to the nonmoving party. *Lincoln Gen. Ins. Co.*, 401 F.3d at 350. "[C]onclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence'" are not enough to defeat a properly supported motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). The nonmovant must "articulate the precise manner in which the submitted or identified evidence supports [the] claim." *CQ, Inc. v. TXU Mining Co.*, 565 F.3d 268, 273 (5th Cir. 2009) (quoting *Smith ex rel. Estate of Smith v. United States*, 391 F.3d 621, 625 (5th Cir. 2004)).

The court is required to consider the cited evidence but may also consider other materials in the summary judgment record. Fed. R. Civ. P. 56(c)(3). When considering a motion for summary judgment, a district court should not "weigh the evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence." *RKB HydroTech Professionals, LLC v. Ecozonix, LLC*, Civil Action No. 2-21-CV-00427-JRG, 2022 WL 2918605, at *1 (E.D. Tex. July 21, 2022) (citing *Honore v. Douglas*, 833 F.2d 565, 567 (5th Cir. 1987)).

### 3. *Trade Secret Misappropriation under DTSA and TUTSA*

Because claims for trade secret misappropriation under DTSA and TUTSA require proof of the same elements (other than the interstate commerce element required for the federal statute, which is not at issue here), courts generally analyze them together. *See, e.g.*, *M-I L.L.C. v. Q'Max Sols., Inc.*, No. H-18-1099, 2019 WL 3565104,

at *3 (S.D. Tex. Aug. 6, 2019). The statutory language of both DTSA and TUTSA are virtually identical. The parties have not argued that DTSA and TUTSA require different elements of proof.

To prevail on a cause of action under either statute, Clean Energy must prove: (1) the existence of a trade secret; (2) that was acquired through the breach of a confidential relationship or through improper means; (3) which Trillium used without Clean Energy's permission. *GE Betz, Inc. v. Moffitt-Johnston*, 885 F.3d 318, 325 (5th Cir. 2018).[3] The statutes phrase the cause of action to require only two elements: (1) the existence of a trade secret; and (2) misappropriation. 18 U.S.C. § 1836(b)(1); Tex. Civ. Prac. & Rem. Code § 134A.004(a).

"Trade secret" is defined by DTSA to mean:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if . . . the owner [of the trade secret] has taken reasonable measures to keep [the] information secret[] and . . . the information derives independent economic value, actual or potential, from not being generally known to, and not being readily

---

[3] The court notes that both DTSA and TUTSA define misappropriation in two general ways. The first way appears to allow for a cause of action for improper acquisition (not use) of the trade secret. 18 U.S.C. § 1839(5)(A); Tex. Civ. Prac. & Rem. Code § 134A.002(3)(A). The other way allows for a cause of action when the trade secret is actually used. 18 U.S.C. § 1839(5)(B); Tex. Civ. Prac. & Rem. Code § 134A.002(3)(B). Cases decided based on the law as it existed before DTSA and TUTSA were enacted, 2016 and 2013, respectively, generally require proof of "use" of the trade secret in all cases. *Cf. Bohnsack v. Varco, L.P.*, 668 F.3d 262, 279 (5th Cir. 2012). The parties here seem to agree that the causes of action in this case may succeed only upon proof of use and discuss at length the caselaw decided pre-DTSA and -TUTSA. Thus, the court takes as a given that "use" is a required element and leaves for another day the question of whether DTSA and TUTSA causes of action may succeed upon a showing of improper acquisition only.

ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3). As it is relevant here, "misappropriation" means:

(B) disclosure or use of a trade secret of another without express or implied consent by a person who—

(i) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—

(I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret . . .; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret . . . .

18 U.S.C. § 1839(5)(B). The definition of "improper means" includes theft and "breach of a duty to maintain secrecy."
18 U.S.C. § 1839(6)(A).

### A. *The Existence of a Trade Secret*

Trillium argues that Clean Energy's trade secrets are publicly available information. ECF No. 182 at 19. According to Trillium, Clean Energy is seeking to protect as trade secrets the proposals it submits and the contracts it obtains as a result of those proposals, both of which are publicly available through a FOIA request. *Id.* Clean Energy counters that it is not seeking to protect the final proposals and contracts, but the confidential information it uses to create the proposals themselves. ECF No. 190 at 1. That is, the ultimate price Clean Energy bids is not a secret, but the data it used to decide what price to bid is. *Id.* Such information includes "internal financial data, bid pricing models, and customer strategy documents[.]" *Id.* Specifically, Clean Energy describes its "site statements[,]" which include confidential data and information specific to customers and

sites. *Id.* at 2. The court understands the site statement spreadsheets to constitute financial models by which Clean Energy can formulate a competitive bid price in response to an RFP. *See, e.g.*, ECF No. 190-1 at 215–32, ECF No. 190-1 at 305–10.

Clean Energy attached as Exhibit 7 to its Response to Defendants' Motion for Partial Summary Judgment (Response) one of its site statements that the parties refer to as the DTLA Model. ECF No. 190-1 at 233-51. Throughout the DTLA Model, at the top of pages is the warning "** CONFIDENTIAL**" in all caps with asterisks and at the bottom of pages the warning that "[t]his document contains Confidential/Proprietary Information that is not to be shared outside of the company. As company property, it should not be sent to a personal email address." *Id.* Other examples of site statements were attached to the Response as Exhibits 11 and 14. *Id.* at 305, 425. Attached to Clean Energy's Response is the declaration of Chris Patton, one of Clean Energy's lawyers, which states that several other examples of similar pricing models were exchanged during discovery. ECF No. 190-2. Trillium has not objected to the court's consideration of Patton's declaration. It appears to the court that the other site statements referenced could be authenticated and would be admissible at trial. Thus, the court considers them at this stage as part of the summary judgment record. See Fed. R. Civ. P. 56(e)(2).

Mark Barton, Clean Energy's Vice President, testified that a site statement includes all the account information for a customer and is a profit and loss statement for that profit center. ECF No. 190-1 at 193. He explained that the site statements are not shared with the customers. *Id.* Nate Jensen testified that site statements are "the Rosetta Stone for [Clean Energy's] business." *Id.* at 255. He explained that site statements have the pricing and margins for all Clean Energy's customers. *Id.* Derek Turbide explained that site statements are used almost always to determine the price to offer to a customer in response to a request for proposal. *Id.* at 300.

Jensen explained that site statements are "tightly controlled," and that even he did not have access to them. ECF No. 190-1 at 255. Clean Energy required Forrest and Love to sign confidentiality agreements when they began their employment. *Id.* at 699, 712. The

7

agreements required the return of all copies of any confidential information upon the employee's departure from Clean Energy. *Id.* at 712.

In its Reply, while maintaining its general position that the identified trade secrets are not trade secrets, Trillium does not engage in any analysis to demonstrate that the identified categories of information would not be protectable as a trade secret, that Clean Energy did not take steps to keep the information confidential, or that the information is publicly known. Clean Energy has presented undisputed evidence that it keeps the identified information confidential. ECF No. 190-1 at 255. Site statements are not shared with customers. *Id.* at 193. There is no dispute that compilations of data that enhance a business's ability to obtain contracts are valuable. That value would be substantially diminished if the information were shared with competitors. The court concludes that Clean Energy has presented sufficient evidence at this stage to raise a fact issue about whether its site statements and related information used to formulate bids constitute trade secrets. This is the sort of information that is routinely found to be trade secret. *Cf. Keurig Dr Pepper Inc. v. Chenier*, No. 4:19-CV-505, 2019 WL 3958154, at *4 (E.D. Tex. Aug. 22, 2019) (citing *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd)).

Clean Energy also identifies as trade secrets its negotiating strategies and bid pricing analysis for the proposed LA County contract. ECF No. 190 at 7 (citing ECF No. 190-1 at 428). Trillium argues that this document was never identified by Clean Energy as a trade secret. This appears to be true. Also at issue are Love's notebooks, only small snippets of which are before the court. Clean Energy also lists several other categories of trade secrets to include project budget analyses for assessing potential bids, customer billing matrices, customer site reviews, customer volume reports, site sector reports, customer lists, and its sales manual. *Id.* at 7–8. Clean Energy did not attach any of these things to its Response and cites only to its Second Amended Trade Secret Designation, ECF No. 147, which itself does not have any exhibits. Thus, the court cannot review many of the

things Clean Energy says are its trade secrets. The court need not decide whether these things are trade secrets, because, as will be discussed next, there is sufficient evidence at this stage for a jury to consider whether Trillium misappropriated the site statements to obtain contracts with Nevada RTC and the County of Los Angeles.

### B. *Charles Love and Ryan Forrest Removed Site Statements from Clean Energy in Violation of their Confidentiality Agreements*

Charles Love began working at Clean Energy as a business development manager in 2012. ECF No. 190-1 at 291, 380. He signed a confidentiality agreement when he was hired. *Id.* at 342. It is undisputed that Love had access to many of the categories of information that form the basis for this lawsuit, including site statements. His first job responsibilities in 2012 were to sell and manage mass transit accounts in southern California. *Id.* at 291. Love also worked on the Nevada RTC account and documented his work on that account in notebooks that he kept while he worked at Clean Energy. *Id.* at 722, 726.

Clean Energy has presented evidence that Love was considering opportunities with Trillium as early as October 2015. ECF No. 190-1 at 442, 444, 446. After Love's Travel acquired Trillium in March 2016, as is reflected in Love's notebooks and his deposition testimony, Love met with Trillium employees, including Bill Cashmareck and Bill Zobel, to explore employment opportunities. *Id.* at 360–364, 450, 455, 733. Love continued working at Clean Energy through September 2016. *Id.* at 380.

Love resigned from Clean Energy on September 29, 2016. ECF No. 190-1 at 374. He told his superiors at Clean Energy that he was going to work for Love's Travel, not Trillium, and that he would not be competing against Clean Energy. *Id.* at 372–73. Love refused to sign an acknowledgement that he had agreed to a non-disclosure agreement, although Love took the position during his deposition that he thought he was refusing to sign a non-compete agreement. *Id.* at 379.

Love admitted at his deposition that he loaded Clean Energy files onto two USB drives before he resigned. ECF No. 190-1 at 386. Love's explanation for doing so is that he needed the documents to aid him in a back wages claim against Clean Energy. *Id.* at 385. Forensic analysis shows that Love accessed many Clean Energy files on his Trillium computer while employed at Trillium. ECF No. 148-2 at 299–304. Files relevant to this case that he accessed while working at Trillium included one named "Site Statement 2015 – Western CNG" and one named "LA MTA\Metro Proposal RFP OP133367106 v6." *Id.* at 300 (showing access on October 13, 2016, two weeks after he resigned from Clean Energy), 304 (showing access on February 6, 2017). Both files show creation dates of September 26, 2016, which is three days before Love resigned from Clean Energy. *Id.* Love claims that the "Western CNG" site statement he accessed just three days after he started at Trillium was not the cite statement itself but his notes about the project. ECF No. 190-1 at 390. Whether that is the truth is a question for the jury. Moreover, as will be discussed below, it appears that Love lost or destroyed the USB drives on which the files were stored at a time when he was under a duty not to do so. This may, in the court's discretion, lead to an adverse inference instruction at trial, which is also for the jury's consideration. Thus, Clean Energy has produced evidence raising a fact issue for the jury to determine whether Love took trade secrets from Clean Energy to Trillium, in violation of his confidentiality agreement.

After Love left Clean Energy, Forrest took over some of Love's responsibilities. ECF No. 190-1 at 261. Forrest and Love texted with each other numerous times between September 2016 and July 25, 2017, when Forrest resigned from Clean Energy. *Id.* at 476–483. The texts show that Love recruited Forrest to join Trillium. *See id.* The texts show that Love set up meetings for Forrest to meet Cashmareck, gave Forrest information about Trillium's management structure, and spoke to him on the phone many times. *Id.* at 477–483. Forrest's testimony confirms what the texts show. ECF No. 179-6 at 5–8.

Forrest's job interview with Trillium management employees took place on approximately June 22, 2017. ECF No. 190-1 at 266. On June 26, 2017, Forrest forwarded a site statement to himself at his

personal email address. *Id.* at 312 (email), 426 (attachment). On July 20, 2017, Trillium told Forrest he would be getting a formal offer of employment. ECF No. 179-6 at 10. Forensic evidence shows that on July 24, 2017, between noon and 4:00 p.m., Forrest accessed the Clean Energy Intranet "Customer Relations Database" multiple times. ECF No. 177-1 at 148. Among other things, he searched for "Sunline Transit and OCTA," (OCTA apparently refers to the "Orange County Transit Authority"). *Id.* That same day at 4:50 p.m., Forrest inserted a USB thumb drive into his Clean Energy laptop and removed it at 5:55 p.m. *Id.* 148–49. During that time, Forrest was actively reviewing various files on his clean energy laptop. *Id.* at 149. During that same time Forrest also saved from his Clean Energy laptop to the USB drive thousands of other Clean Energy documents, including site statements. *Id.* at 150–54. Several of the site statements had filenames including the words "CNG Site Statement – Western." *Id.* at 150. Forrest then immediately inserted the same USB drive into his personal laptop where it stayed for an hour. *Id.* at 154. Forrest resigned on July 25, 2017. ECF No. 190-1 at 274. Forrest's first computer at Trillium was infected by malware, so it could not be examined to determine whether Forrest accessed the site statements from his official Trillium computer. *Id.* at 286. But the evidence shows that Forrest had access to the documents on his personal computer while employed at Trillium. Clean Energy has produced evidence raising a fact issue for the jury to determine whether Forrest took trade secrets from Clean Energy to Trillium, in violation of his confidentiality agreement.

### C. *Use of the Site Statements in Connection with Nevada RTC and Los Angeles County*

A cause of action for trade secret misappropriation accrues when the trade secret is actually used.[4] *GE Betz*, Inc., 885 F.3d at 325–26. Any exploitation of the trade secret likely to injure the owner or

---

[4] *But see* note 3, above.

enrich the defendant constitutes a "use." *Id.* at 326. Proof of "use" often depends upon circumstantial evidence. *Id.*

### i.   *Nevada RTC*

Nevada RTC was a Clean Energy customer for its O&M services since 2008. In January 2018, Nevada RTC issued a competitive bid request for an O&M services contract. ECF No. 190-1 at 607–71. At the time the bid request was issued, Trillium's point of contact for Nevada RTC was Ryan Erickson. *Id.* at 198. Ryan Forrest ended up being tasked with business development for the region in which Nevada RTC was located. *Id.* at 203. He was involved in the bid for the Nevada RTC contract and was listed as Trillium's point of contact for all questions about the proposal. *Id.* at 869.

In January 2018, Erickson and Zobel discussed their estimations of Clean Energy's and Trillium's respective costs to perform the Nevada RTC contract. ECF No. 190-1 at 156–57. In therms—a unit of measure for energy, Zobel and Erickson estimated Clean Energy's cost to be 15.4 cents.[5] *Id.* at 157. By the time Trillium's bid was submitted, however, the price used for the proposal was slightly above 5 cents per therm—one third of their estimate just a month earlier. *Id.* at 288. This change is a central point of contention between the parties. According to Clean Energy, slightly above 5 cents per therm is almost exactly Clean Energy's cost for the very work the bid envisioned. That cost was contained on a site statement to which Love and Forrest had access while Trillium was formulating its bid. Thus, according to Clean Energy, Trillium's winning bid was a result of its misappropriation of Clean Energy's trade secrets. Trillium argues that there is no evidence that Trillium's cost proposal was based in any way on Clean Energy's confidential cost data.

---

[5] The court notes that the deposition testimony is somewhat confusing here. At one point Zobel testified that he was estimating Clean Energy's costs, but when counsel asked him the same question again, it appears that Zobel was estimating Trillium's costs. Either way, the January 2018 thinking about costs is triple what the bid ended up being.

The court understands the bidding process to have allowed Nevada RTC to score the bids on several factors. According to the Nevada RTC request for proposal (RFP), the bidder's "Staffing Plan/Organizational Structure of Team" would account for 15%, the bidder's "Qualifications, Experience and Past Performance" would account for 20%, the "Work Plan" would account for 20%, the bidder's "Local Knowledge and Experience" would account for 10%, and the price proposal would account for 25%. ECF No. 190-1 at 612–13.

To estimate Trillium's score against Clean Energy's score, Forrest and Gabriel Duenas modified a pre-existing spreadsheet to include a tab called "CLN Proposal Comparison." ECF No. 190-1 at 681, 683. According to Duenas, the spreadsheet allowed him to choose among percentages by which Clean Energy might hypothetically underbid Trillium, and the spreadsheet would calculate the weighted scores accordingly. ECF No. 182-7. Thus, according to Trillium, the data in the tab entitled "CLN Proposal Comparison" did not come from Clean Energy. Rather, it is generated from Trillium's estimated cost in the column next to it.

The court understands Clean Energy's point to be that, while the data in the "CLN" column of the "CLN Proposal Comparison" tab is generated mathematically from the column next to it called "TTF," i.e., Trillium Transportation Fuels, the TTF column contains information that came from Clean Energy's site statements. The TTF column shows just over 5 cents per therm, which is a third of what Trillium thought its costs would be a month earlier and, according to Clean Energy, is almost exactly equal to its costs as reflected in its trade secret site statements. In other words, Trillium's starting point for estimating scores that may result, depending on how much Clean Energy underbid Trillium, was based on information stolen from Clean Energy.

To prove its point, Clean Energy submitted part of one of its site statements for "Las Vegas RTC," which the court reads to demonstrate that Clean Energy's confidential cost estimate was just over 5 cents per therm. ECF No. 190-1 at 693. Trillium argues that the Las Vegas RTC site statement contains no evidence that Clean Energy calculated its cost to be close to 5 cents. The court disagrees.

The CLN Proposal Comparison tab shows that Trillium estimated the Nevada RTC project would involve a usage of 472,139 therms for fiscal year 2018. ECF No. 190-1 at 681. That would place the project between Tier 5 and Tier 6 on the Las Vegas RTC site statement. *Id.* at 693 ("Tiered Pricing" chart). That would correspond to a cost per therm of between 5.6 and 5.9 cents. *Id.* ("Cost Per Unit" chart).

In summary, there is evidence from which a jury could determine that Trillium estimated its cost per therm to be about 15 cents but that it bid the price to be 5 cents. There is also evidence from which the jury could determine that Clean Energy's cost was just over 5 cents, as reflected on a trade secret site statement to which both Love and Forrest had access after they left Clean Energy. That is sufficient at this point, in conjunction with other facts discussed next, to demonstrate a fact issue about whether Trillium used Clean Energy's trade secrets to underbid Clean Energy.

### ii. *LA County*

Forrest worked on the County of Los Angeles account while he was at Clean Energy. ECF No. 190-1 at 284. During his deposition, Forrest seemed unable to identify the timing of his work on that project, but in an August 25, 2016 email, Forrest updated other Clean Energy employees on the status of the "County of Los Angeles Alameda Station Contract Extension." *Id.* at 921. Forrest denies working on the LA County account while at Trillium, but the court notes that, in a text message sent on July 25, 2017, the day Forrest resigned from Clean Energy, Love says to Forrest "BTW, now that[] its official, we just left a meeting with LA DOT," to which Forrest responds "CE is going to b hurting." ECF No. 190-1 at 484. That email was sent one day after Forrest downloaded the DTLA site statement to his USB drive along with 2000 other Clean Energy documents. ECF No. 177-1 at 151. Love's journal entry for January 8, 2016, includes a note stating "LADOT – Meeting." ECF No. 190-1 at 731. Moreover, although his role is not clear, Love was included on emails discussing the County of Los Angeles CNG station replacement. *Id.* at 924. Clean Energy had an existing contract with LA County but lost the account to Trillium after Forrest joined Trillium. Viewed in light of all the other evidence in this case, there is sufficient evidence from which the

jury could conclude that Trillium used Clean Energy's trade secrets in connection with the Los Angeles County contract.

### D. Other Circumstantial Evidence Showing Misappropriation

There are several other facts and events that the jury may consider to be circumstantial evidence of misappropriation.

Clean Energy has produced evidence to show that Love went to some lengths to hide his work activities at Trillium from Clean Energy. Love resigned from Clean Energy on September 29, 2016. He refused to sign an acknowledgement that he had agreed to a non-disclosure agreement, although, again, Love took the position during his deposition that he thought he was refusing to sign a non-compete agreement. ECF No. 190-1 at 375. He told his superiors at Clean Energy that he was going to work for Love's Travel, not Trillium, and that he would not be competing against Clean Energy. *Id.* at 372–73. But just three days after starting his job at Trillium he began accessing documents he had downloaded from his Clean Energy computer. ECF No. 148-2 at 300 (showing Love accessed a document entitled "Site Statement 2015 – Western CNG.pdf" from his Trillium computer on October 13, 2016). Again, Love claims he did this in support of his claim for wages owed.

In a December 2, 2016 email to Zobel and copied to Cashmareck, Love explains that he updated his LinkedIn profile to say he was working for Love's Travel, not Trillium. ECF No. 190-1 at 774. This matched the story he told to Clean Energy when he resigned. He also stated in the same email that he would attend an RNG conference as a mere learning opportunity, although it turned out that he was soliciting Clean Energy's customers while at the conference. ECF No. 148-2 at 30-31; ECF No. 190-1 at 774. The email makes clear to Trillium's management that Love was very purposefully hiding from Clean Energy the type of work that he was doing at Trillium. Love states "my goal is to wrap up these deals before they find out what we did." ECF No. 190-1 at 774. Love has admitted that he was not truthful about going to work for Trillium, not Love's. ECF No. 190-1 at 371–72. While the court understands that this activity, in and of itself, is

lawful, in the context of the rest of the evidence, the jury could view it as part of a plan to misappropriate Clean Energy's trade secrets.

After Clean Energy employees saw Love at the RNG conference, Clean Energy began to suspect that Love had taken confidential information. This prompted Clean Energy to send Love a cease-and-desist letter on December 8, 2016, demanding return of all Clean Energy confidential information and to notify anyone with such information in their possession to retain it. ECF No. 190-1 at 938–41. The letter explicitly referred to USB devices. *Id.* at 940. On December 13, 2016, by letter from his lawyer, Love stated that he was not in possession of any confidential or trade secret information belonging to Clean Energy. *Id.* at 735. On December 15, 2016, Clean Energy sent a second letter demanding the return of documents and/or USB drives that were prepared "at, by, or for Clean Energy." ECF No. 148-1 at 18. By letter dated December 19, 2016, Love's counsel again insisted that Love was not in possession of Clean Energy's materials of any kind. ECF No. 152-1 at 28.

Despite these warnings, Love continued to access files on the USBs from his Trillium computer in February and July 2017. ECF No. 148-2 at 303–04. Love admitted to having the USB drives as late as July 30, 2017, when confronted during his deposition with forensic evidence demonstrating his access to those drives on that date. ECF No. 190-1 at 395. Love stated during his deposition that he "destroyed" the information he took from Clean Energy but corrected himself and stated that he no longer had the USB onto which he saved the files. ECF No. 148-2 at 67–68. Love also admitted in his deposition that he took his notebooks with him when he left Clean Energy and stored them in his office in Texas. ECF No. 190-1 at 403–04.

It is unknown when Love last had access to the USB devices. The court notes that Clean Energy sent Forrest a cease-and-desist letter on August 2, 2017, reminding him of his confidentiality agreement with Clean Energy. ECF No. 179-12 at 2. The letter affirmatively stated "[w]e have since [your resignation] become aware that you continue to be in possession of . . . [Clean Energy's] 'Company Information.'" *Id.* at 3. The letter requested that Forrest preserve any Clean Energy documents. *Id.* Forrest emailed Trillium's president,

16

Bill Cashmareck, a copy of the letter on August 3, 2017. ECF No. 190-1 at 497. Thus, Love's last known possession of the USB drives is very close to the point in time that Trillium was on notice that Clean Energy believed Forrest was in possession of its trade secrets.

There is evidence that Love was considering employment with Trillium in October 2015, ECF No. 190-1 at 442, 444, 446, and that Trillium began recruiting him in March 2016, ECF No. 190-1 at 360–364, 450, 455, 733. Love continued working at Clean Energy through September 2016. ECF No. 190-1 at 380. The parties agree that Love was a meticulous note-taker and filled approximately twenty notebooks while working for Clean Energy (the court estimates that to be about one notebook per quarter). *Id.* He started a new notebook in April 2016 to document his dealings with Trillium. *Id.* at 359. It appears that he began taking notes about his meetings with Trillium but stopped on May 9, 2016. *Id.* at 364. Despite continuing to work at Clean Energy, and continuing his employment negotiations with Trillium, Love apparently has no notes for the last five months of his employment with Clean Energy. ECF No. 190-1 at 359–66. Moreover, although Love denies looking at his notes from Clean Energy while employed at Trillium, a notebook entry dated November 25, 2016, two months after he started working at Trillium, says "Review old journal – notes." ECF No. 190 at 472. Even if the notes cannot be shown to be trade secrets, the court concludes that the jury may consider as circumstantial evidence of misappropriation Love's retention and intent to use his notes in his new job.

Forrest's actions mimic Love's. Again, Clean Energy wrote Forrest a cease-and-desist letter on August 2, 2017, which Forrest forwarded to Trillium management the next day. ECF No. 179-12; ECF No. 190-1 at 497. In an August 10, 2017 letter, Forrest denied having possession of anything taken from Clean Energy other than personal, financial, and educational materials. ECF No 190-1 at 503. Forrest testified that he discovered sometime in August 2017 that he did have Clean Energy's information on a USB drive. ECF No. 179-6 at 15. Instead of retaining the documents as the letter instructed, he deleted the documents. *Id.* at 15. It is unknown whether Forrest copied Clean

Energy's documents to his Trillium computer because it became infected by malware and had to be replaced.

Forrest testified that he did not intend to download anything but his personal information to the USB drive. ECF No. 190-1 at 275. He explains that he inserted the drive into his computer, began the copying process, went out to meet someone, returned and removed the USB drive from the computer and did not look at what was copied. *Id.* at 278–82. As discussed, however, during the time that the files were being copied, the computer was being actively used to access other Clean Energy information, and the USB drive was immediately placed into Forrest's personal computer. The jury may consider Forrest's actions and his explanation.

Forrest's mimicry of Love is not surprising, given that the two appeared to have coordinated Forrest's actions in connection with his resignation from Clean Energy. Emails between Forrest and Love show that Love and Forrest made a plan for what Forrest would do and say when he resigned. For example, Forrest tells Love "no exit interview," and "handled it the way we discussed." ECF No. 190-1 at 484. As did Love, Forrest refused to sign the acknowledgement of his non-disclosure agreement. ECF No. 190-1 at 495. A minute after the "handled it the way we discussed" text message, Love says to Forrest "BTW, now that[] its official, we just left a meeting with LA DOT," to which Forrest responds "CE is going to b hurting," to which Love responds "yes." ECF No. 190-1 at 484.

The court concludes that there is sufficient evidence for this case to go to the jury.

### 4. Trillium's Arguments

Trillium argues that there is no basis upon which to hold Trillium responsible for Love's and Forrest's actions. Clean Energy cites *Blue Star Press, LLC v. Blasko*, No. SA-17-CA-111, 2018 WL 1904835, at *3 (W.D. Tex. Mar. 6, 2018), for the proposition that nearly every jurisdiction that has adopted the Uniform Trade Secrets Act "has held that vicarious liability can apply to trade secret claims." Trillium does not address this argument. It appears that Love and Forrest were acting in the course and scope of their employment

during significant portions of the timeline set forth above. There is at least a fact question about whether Trillium is vicariously liable for Love's and Forrest's acts of misappropriation.

Vicarious liability aside, as discussed above, management at Trillium knew that Love was attempting to hide his activities from Clean Energy. They then find out that Forrest was being accused of misappropriating confidential information. They assigned Forrest to the Nevada RTC project, which they knew Clean Energy would be bidding on, while knowing that Clean Energy was accusing Forrest of having possession of Clean Energy's confidential information and trade secrets. There is no evidence that anyone in Trillium's management took any steps to wall Forrest or Love off from any deal that might involve use of Clean Energy's information. There is at least a fact question about whether Trillium's management team was involved in and approved of Forrest's and Love's actions.

Trillium relies on *GE Betz* to argue that the evidence Clean Energy has presented is insufficient circumstantial evidence of use of the site statements. *GE Betz* does have many factual parallels to this case. It involved an employee with a non-disclosure agreement who went to work for a competitor. *GE Betz*, 885 F.3d at 321–23. The employee was even accused of downloading thousands of files and emailing files to herself before she left employment with the plaintiff. *Id.* at 322. She also hid from her former employer her intention to compete with it. *Id.* But the parallels stop there. There was no evidence that the defendant-employee accessed any trade secret or confidential information while employed with the defendant-employer; there was no evidence of destruction of evidence; there was nothing to show any likelihood that the trade secret was used.

This case is more akin to the facts in *Aspen Tech., Inc. v. M3 Tech., Inc.*, 569 F. App'x 259 (5th Cir. 2014). In that case, the court found sufficient circumstantial evidence of use based on one of plaintiff's former employee's admission that he had used a customer list after joining the defendant company, despite that employee having an explanation to support non-use; evidence that a trade secret pricing calculator was found on one of plaintiff's former employee's hard drive; an adverse inference drawn from one of the plaintiff's

former employee's invocation of the Fifth Amendment; and an adverse inference drawn from the fact that the same former employee had spoliated evidence. *Id.* at 266.

Here, as in *GE Betz*, there is evidence that Love and Forrest took confidential and trade secret information with them to Trillium; that the two hid their intentions from Clean Energy; and that Trillium had eventual success with Clean Energy's clients. But there is also evidence to show, among the many other things detailed above, that information from a site statement found its way into Trillium's Nevada RTC bid; that Love accessed trade secrets from his Trillium computer; and that both Forrest and Love either lost, destroyed, or attempted to destroy evidence when under a duty not to do so.[6] The court concludes that there is ample evidence from which a jury could conclude that Trillium used Clean Energy's trade secrets.

### 5. *Conclusion*

Because there are genuine issues of material fact, the court recommends that Trillium's motion for summary judgment be denied.

The parties have fourteen days from service of this Report and Recommendation to file written objections. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. Failure to timely file objections will preclude appellate review of factual findings or legal conclusions, except for plain error. *See Thomas v. Arn*, 474 U.S. 140, 147–49 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276–77 (5th Cir. 1988). Responses to objections are due fourteen days after the objection is filed.

Signed at Houston, Texas, on August 24, 2022.

Peter Bray
United States Magistrate Judge

---

[6] The court has deferred until trial a ruling on whether a spoliation instruction is appropriate. ECF No. 204.